# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| DUHHAINE WAEKER and HOLLIE WAEKER, | ) ) ) | |
| Plaintiffs, | ) ) | **CIVIL ACTION** |
| v. | ) ) | No. 05-1347-MLB |
| AMERICAN FAMILY MUTUAL INSURANCE COMPANY, | ) ) ) | |
| Defendant. | ) ) | |

---

## MEMORANDUM AND ORDER

This matter comes before the court on defendant American Family Mutual Insurance Company's motion for summary judgment. (Doc. 23.) The motion has been fully briefed and is ripe for decision. (Docs. 24, 28, 29, 38.) Plaintiffs' claims are for breach of contract, unlawful insurance claims practices, and waiver and estoppel. (Doc. 22 at 12.) Defendant moves for summary judgment on all of plaintiffs' claims. The motion is GRANTED for the reasons stated herein.

## I.  FACTS[1]

---

[1] Plaintiffs were represented by counsel at the time they filed their complaint and were represented by the same counsel throughout discovery, preparation of the pretrial order, and briefing on defendant's motion for summary judgment. After the summary judgment motion was fully briefed, however, plaintiffs' status changed. In unrelated proceedings, plaintiffs' counsel was excluded from practicing in the United States District Court for the District of Kansas.

On March 26, 2007, plaintiffs were given the opportunity to stay the current proceedings while they obtained new counsel. Plaintiffs consented to the court's suggestion that if no new counsel entered on their behalf, the court would rule on the pending motion for summary judgment. No new counsel has since entered an appearance in this case on plaintiffs' behalf.

As a result, the court treats plaintiffs as pro se litigants. Pro se pleadings must be liberally construed. See Hall v. Bellmon,

In February 2000,[2] defendant issued comprehensive homeowners insurance policy number 15-DT2588-01 (the "policy") to plaintiffs on their home in Newton, Kansas.  The application for the policy was signed by plaintiff Duhhaine Waeker.  The issued policy was sold on behalf of the Greg Raleigh Insurance Agency ("Raleigh Agency") in Newton.  The policy limit for theft of personal property on premises was $81,200.  Plaintiffs paid the premiums due and renewed the policy, which was in effect through September 30, 2003.  The policy was canceled and not in force as of October 1, 2003.

The policy states, in pertinent part, that it does not cover dwellings under construction for personal property theft, until the dwelling is "complete and occupied."  The policy also states that it does not cover personal property theft from dwellings which are vacant for more than thirty consecutive days immediately before the loss.  The policy excludes coverage for claims premised on fraud, and fraud is a defined term within the policy.

Plaintiffs' application for the policy stated that plaintiffs were "completely redoing and adding to the house" and that the "roof has nothing on top - he's replacing now."  In the "ROOF" box,

---

935 F.2d 1106, 1110 & n.3 (10th Cir. 1991).  Liberal construction does not, however, require this court to assume the role of advocate for the pro se litigant.  See Hall, 935 F.2d at 1110.  In the end, plaintiffs pro se status, in and of itself, does not prevent this court from granting summary judgment.  See Northington v. Jackson, 973 F.2d 1518, 1521 (10th Cir. 1992).

[2] The parties' pretrial order stipulates that the homeowners' insurance policy was issued in February 2001.  However, the uncontroverted facts show that plaintiffs applied for homeowners insurance on February 18, 2000.  The precise year of the issuance is not material to the court's determination of the issues decided herein.

plaintiffs marked the box for "Asphalt Shingles" and in the "YR INSTALLED /UPDATED" box, wrote "2000 putting on now."  In fact, after the roof had been damaged by a storm in 1994, plaintiffs covered the existing roof structure with a "roof sealing material and tarps" but never put a new shingle roof on the house.  In 1995, Duhhaine Waeker began to build new walls around plaintiffs' dwelling, intending to roof over the new structure and tear down the old house from the inside.  The tarp covering remained on the roof of the house for the next eight years.

When the policy was issued, defendant knew plaintiffs' home was being remodeled while plaintiffs continued to live in the home. Defendant's representatives inspected the premises before the insurance policy was issued.  In addition, in 2001, plaintiffs made a roof damage claim and defendant's inspectors viewed plaintiffs property at that time.  Duhhaine Waeker states that while defendant's inspectors were at the home in 2001, he gave them a complete tour of the premises and explained the entire reconstruction project to them in detail.

In 2002, the City of Newton sued plaintiffs and claimed plaintiffs' dwelling constituted a nuisance.  Plaintiffs were represented in the litigation by attorney Stephen Johnson.  By court directive on October 16, 2002, plaintiffs were given until January 1, 2003 to eliminate the nuisance conditions and the court authorized the City of Newton to remove the structures if plaintiffs failed to meet the deadline.  Plaintiffs did not meet the January 1, 2003 deadline. By court order on June 26, 2003, plaintiffs were given until October 1, 2003 to vacate and remove all personal property from their

-3-

dwelling.  The court authorized the City of Newton to demolish the dwelling with no obligation to salvage any property left at the dwelling.  The local newspaper published articles about the October 1, 2003 deadline and the planned razing of plaintiffs' dwelling.

On January 1, 2003, plaintiffs acquired a trailer and began packing their personal property into the trailer.  By September 28, 2003, plaintiffs had moved virtually everything but computers into the trailer.  Other items, including furniture, were stored by plaintiffs at Dr. Hendrickson's[3] home.  As of September 30, 2003, plaintiffs had no place to go to live.  Plaintiffs testified that, on either September 29 or September 30, 2003, they drove from the City of Newton to Olathe, Kansas to return a borrowed truck to a friend.  Plaintiffs testified that they intended to return the same day.

On October 1, 2003, Duhhaine Waeker was seen in the Olathe Medical Center's emergency room.  Medical records obtained from Olathe Medical Center show that Duhhaine Waeker was also admitted to Olathe Medical Center, from October 2, 2003 to October 4, 2003.  When Duhhaine Waeker became ill, Hollie Waeker contacted their attorney and advised him of the situation.  Plaintiffs' attorney contacted City of Newton and court officials and thereafter an extension was approved by the court to allow plaintiffs to remove the remainder of their personal property from their dwelling after Duhhaine Waeker was discharged from the hospital.

While in Olathe, Hollie Waeker also called Glen Spielman, who had a key to plaintiffs' dwelling, and asked Spielman to help plaintiffs

_____

[3]  Neither party defines for the court who Dr. Hendrickson is in relationship to plaintiffs.

by getting anything valuable out of the dwelling in Newton.  Spielman went to plaintiffs' dwelling and took out computers, monitors, and a phone.  Spielman delivered the monitor to plaintiffs' friend, Don Smith.  Spielman claims he also delivered the computers and phone to Smith but plaintiffs deny this.

By way of affidavit, Al Kostlecky, an acquaintance of plaintiffs, states that on September 29, 2003 he went to plaintiffs' dwelling at approximately 4:00 pm.  Kostelecky states that when he arrived, Spielman and his two sons were at plaintiffs' dwelling with a truck and trailer loading large quantities of construction materials and other items, including several large bundles of copper tube plumbing. By way of affidavit, a business associate of plaintiffs, Matthew Norris, states that he also drove to plaintiffs' dwelling sometime in the afternoon of September 29, 2003.  Norris states that he saw three men, none of whom was Duhhaine Waeker, loading large objects onto a truck.  Plaintiffs' neighbor, Linda Rowland told plaintiffs she had seen people taking plaintiffs' property while plaintiffs were away. Rowland told plaintiffs that she had seen numerous unknown persons moving items on the property, loading the property into a large truck and driving it away, probably on September 29 or 30.  In an affidavit, Rowland claims that she telephoned "911" when she saw people taking plaintiffs items.  However, "911" records show no calls during either the last week of September or the first week of October 2003.

On October 2, 2003, Newton's local newspaper ran a front-page story stating that plaintiffs' deadline to vacate had passed on September 30, 2003 and that plaintiffs were in Olathe because Duhhaine Waeker was in the hospital.  Plaintiffs returned to Newton the evening

-5-

of October 4, 2003.  Plaintiffs testified that they stopped at
Spielman's home on October 4, 3003 and that Duhhaine Waeker and
Spielman got into an argument.  Records obtained from "911" show that
Spielman and Duhhaine Waeker got into an argument at Spielman's home
on October 5, 2003.

At 9:06 pm on October 4, 2003, after going inside their dwelling
and noticing items that were missing, plaintiffs telephoned the police
to report a burglary.  A police officer arrived at 9:13 pm and took
a report.  The police officer's report states that Duhhaine Waeker
told the officer he had traveled to Kansas City on September 30, 2003
and had returned home that evening, on October 4, 2003.  The officer's
report also states that Duhhaine Waeker told the officer that no one
else had a key to the house.  The officer's report states that there
is no sign of forced entry into the dwelling.  The officer's report
makes no mention of Spielman.  The officer's report lists nine missing
items, including, _inter alia_, an HP computer, a Sony computer and
monitor, and a phone, with a total value of $10,100.

Duhhaine Waeker testified that he went to the Wesley Medical
Center ("Wesley") the evening of October 4, 2003 and was at Wesley for
four days to a week.  However, medical records from Wesley show that
Duhhaine Waeker was seen at Wesley on October 6, 2003 and then was
admitted to that facility from October 8, 2003 to October 9, 2003.
On October 11, 2003, plaintiffs supplemented their police report.  The
supplemental officer's report states that Duhhaine Waeker had found
three additional items missing with a total value of $1000.  The
officer's report also states that Duhhaine Waeker told the officer
that he had located the Sony computer monitor he had earlier reported

-6-

as stolen.  The officer's report states that Duhhaine Waeker told the officer that an individual who was working for him had taken the monitor and transported it to another person.  Duhhaine Waeker later testified that the three items added to the police report on October 11, 2003 were the same as three of the items listed in his original October 4, 2003 police report.  Plaintiffs never gave the police a written list of missing items.

Duhhaine Waeker testified that in October 2003, he left a handwritten list of missing items with Brenda Dalton of the Raleigh Agency.  The Raleigh Agency has no record of receipt of a property list from plaintiffs from that time period.  Dalton does not recall receiving a list, and neither does her supervisor.  Dalton believes she gave Duhhaine Waeker the "800 number" to American Family so that he could report his claim.  By way of affidavit, Duhhaine Waeker states the Dalton gave him the number but that he asked Dalton to report the claim for him and she responded that she would do so.

Ten months later, on August 16, 2004, plaintiffs brought the Raleigh Agency a list of seventy items claimed stolen, with a claimed value of over $70,000.  The Raleigh Agency filed a report with American Family.  On August 17, 2004, American Family assigned a claims handler, Jim Hite, to process the claim.  A senior investigator, Tara Scrogin, was also assigned to the claim.  Between Hite and Scrogin, American Family's records show 109 entries processing plaintiffs' claim.  On December 12, 2004, plaintiffs returned overdue formal documentation of the claim to American Family, increasing their claim to $81,266 and adding new items, including fine wines.  In August 2004 and December 2004, plaintiffs claimed as

-7-

missing the following items that were not included in plaintiffs' police report: a computer server, a scanner, a printer, 30 to 60 tons of limestone on pallets, a washing machine, 30 twelve-foot pine poles, a lawnmower, a tiller, 2 bicycles, 500 concrete blocks, uninstalled doors, windows, 2 bathtubs, 3 base cabinets, mirrored closet doors, and 2 fireplaces.  Included on the August 2004 claims list are the computers and telephone that Spielman claims were delivered by him to Smith but which plaintiffs deny were delivered to Smith.

Scrogin interviewed Spielman and Spielman also gave Scrogin a recorded statement.  Spielman stated that Duhhaine Waeker had asked him to support an insurance claim that items were stolen from plaintiffs' property but that Spielman refused.  Spielman stated that he knew some of the things Duhhaine Waeker was claiming as stolen had been given away, sold, or taken by people after the deadline for plaintiffs to vacate their property and that he had personally helped load some of the items into plaintiffs' trailer.[4]  Spielman also stated that when plaintiffs called from Olathe and asked him to go to their house, the dwelling was unlocked.

Spielman also stated to Scrogin that plaintiffs' former attorney, aided by Spielman, loaded all the limestone rock and took it to his farm, which was the same rock listed on plaintiffs' claim form, and that Duhhaine Waeker had also given his former attorney some doors. Duhhaine Waeker told Hite that some limestone from the original inventory was in the possession of his former attorney because he had bartered various items to his former attorney in exchange for attorney

---

[4]   For example, Duhhaine Waeker stated that he found the gas grill from his claims list in his trailer.

fees owed.  Duhhaine Waeker told Scrogin he did not know what his former attorney had taken.  By way of affidavit, plaintiffs' former attorney, Stephen Johnson, states that the rock he received from plaintiffs is not the same rock that was included on the claim list given to American Family by plaintiffs.  Johnson states that he told this to American Family on several occasions during American Family's investigation.

Spielman told Scrogin that Duhhaine Waeker had given him the brown Napa Field stone listed by plaintiffs on the claim list.  By way of affidavit, Duhhaine Waeker states that neither he nor Hollie Waeker gave Spielman any items of personal property listed on plaintiffs' claim list.  Spielman also told Scrogin that the cement blocks and rebar chairs that plaintiffs had claimed were purchased on their claims list were actually acquired from a school construction job. Duhhaine Waeker claims that part of the rebar was purchased and part was obtained from the construction site.  Spielman stated that a washer claimed by plaintiffs as having a value of $250 with a replacement value of $500 had actually been left as junk.

Spielman further stated that cement board that was on plaintiffs' claim list had been sold to Al Kostelecky.  Kostelecky told Scrogin that he bought cement board from plaintiffs.  By way of affidavit, Kostelecky states that after he was done loading the cement board he had purchased from plaintiffs, there were numerous sheets of cement board left over at plaintiffs' dwelling.

On January 17, 2005, Scrogin spoke to Rowland, plaintiffs' neighbor.  Rowland told Scrogin that she could not remember much except people coming and going at plaintiffs' property.  Later in

-9-

January 2005, plaintiffs' attorney spoke to Rowland and plaintiffs' attorney informed Scrogin that Rowland did not remember the dates that people were at plaintiffs' house.

Plaintiffs did not provide access to their storage trailer until December 21, 2004.  From 2003 to December 21, 2004, plaintiffs had moved personal property among various storage places, including their trailer, Dr. Hendrickson's, a rental storage facility, a neighbor's garage, Smith's home, "Goering's" home, and plaintiffs' former attorney's farm.  By way of affidavit, Scrogin states that she was substantially prejudiced by plaintiffs' delay in formally filing and documenting their claim because, among other reasons, plaintiffs' dwelling had been razed by the City of Newton on October 29, 2003, and plaintiffs had delayed in granting access to their storage areas until December 21, 2004.  By way of affidavit, Duhhaine Waeker states that the delay in viewing the storage trailer was the result of cancellations by defendant.

There is also dispute concerning plaintiffs' living arrangements prior to October 1, 2003.  Scrogin states that Kostelecky told her that he let plaintiffs live in his trailer from July through October. By way of affidavit, Kostelecky states that plaintiffs were still living in their dwelling in the summer months of 2003 and until October 1, 2003.  Kostelecky states that plaintiffs lived in his trailer for about five weeks, starting at the end of October 2003 and into November 2003.  Also by way of affidavit, plaintiffs' neighbor, Fern Goering, states that plaintiffs were still living in their dwelling during the summer months of 2003 and until October 1, 2003. Stephen Johnson, plaintiffs' former attorney, states by affidavity

-10-

that plaintiffs lived in their dwelling until the City of Newton took possession of the dwelling shortly after October 1, 2003.  Rowland and Smith's affidavits state that plaintiffs lived in their dwelling on a regular basis until October 1, 2003.

Scrogin and Hite testified that they did not find any evidence that any property of plaintiffs had been stolen while insured, prior to October 1, 2003.  Defendant's property committee met three times to consider plaintiffs' claim and the status of the investigation.  On May 20, 2005 defendant denied plaintiffs' claim.  On November 4, 2005, plaintiffs filed suit for denial of their theft claim made on the policy.  The personal property loss claimed by plaintiffs totaled $81,266.

## II.  MOTION FOR SUMMARY JUDGMENT STANDARDS

The usual and primary purpose of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  An issue is "genuine" if sufficient evidence exists on each side "so that a rational trier of fact could resolve the issue either way" and "[a]n issue is 'material' if under the substantive law it is essential to the proper disposition of the claim."  Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998) (citations omitted); see also Adams v. Am. Guarantee & Liab. Ins. Co., 233 F.3d 1242, 1246 (10th Cir. 2000) (citing Adler).  The mere existence of some factual dispute will not defeat an otherwise properly supported

motion for summary judgment because the factual dispute must be material. See Renfro v. City of Emporia, 948 F.2d 1529, 1533 (10th Cir. 1991).

Defendant initially must show both an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. See Adler, 144 F.3d at 670. Because plaintiffs bear the burden of proof at trial, defendant need not "support [its] motion with affidavits or other similar materials negating [plaintiffs']" claims or defenses. Celotex, 477 U.S. at 323 (emphasis in original). Rather, defendant can satisfy its obligation simply by pointing out the absence of evidence on an essential element of plaintiffs' claims. See Adler, 144 F.3d at 671 (citing Celotex, 477 U.S. at 325).

If defendant properly supports its motion, the burden then shifts to plaintiffs, who may not rest upon the mere allegation or denials of its pleading, but must set forth specific facts showing that there is a genuine issue for trial. See Mitchell v. City of Moore, 218 F.3d 1190, 1197-98 (10th Cir. 2000). In setting forward these specific facts, plaintiffs must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." Adler, 144 F.3d at 671. If the evidence offered in opposition to summary judgment is merely colorable or is not significantly probative, summary judgment may be granted. See Cone v. Longmont United Hosp. Ass'n, 14 F.3d 526, 533 (10th Cir. 1994). Plaintiffs "cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." Conaway v. Smith, 853 F.2d 789, 793 (10th Cir. 1988). Put simply, plaintiffs must "do more than simply show

-12-

there is some metaphysical doubt as to the material facts."
<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986).

In the end, when confronted with a fully briefed motion for summary judgment, the court must determine "whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986). If sufficient evidence exists on which a trier of fact could reasonably find for plaintiffs, summary judgment is inappropriate. See <u>Prenalta Corp. v. Colo. Interstate Gas Co.</u>, 944 F.2d 677, 684 (10th Cir. 1991).

## III.  ANALYSIS

Plaintiffs allege three claims against defendant: 1) breach of contract; 2) unlawful insurance claims practices; and 3) waiver and estoppel. (Doc. 22 at 12.) Defendant has moved for summary judgment on all three claims. (Doc. 23.) There is no dispute that Kansas law governs these claims. (Doc. 22 at 2.)

## A.  Breach of Contract

In Kansas, the "language of a policy of insurance, like any other contract, must, if possible, be construed in such manner as to give effect to the intention of the parties." <u>Goforth v. Franklin Life Ins. Co.</u>, 202 Kan. 413, 417, 449 P.2d 481 (1969). The risks insured against arising under an insurance policy are determined by the terms of that policy. <u>Isaac v. Reliance Ins. Co.</u>, 201 Kan. 288, 291, 440 P.2d 600, 603 (1968). "[T]he construction and effect of a contract of insurance is a matter of law to be determined by the court." <u>Scott</u>

-13-

v. Keever, 212 Kan. 719, 721, 512 P.2d 346, 349-50 (1973).

The rules governing the interpretation of an insurance contract are well-settled.  Recently, the Kansas Supreme Court succinctly stated these general principles as follows:

> If the language in an insurance policy is clear and unambiguous, it must be construed in its plain, ordinary, and popular sense and according to the sense and meaning of the terms used.  An insurance policy is ambiguous when it contains language of doubtful or conflicting meaning based on a reasonable construction of the policy's language.  An ambiguity does not exist merely because the parties disagree on the interpretation of the language.
>
> To determine whether an insurance contract is ambiguous, the court must not consider what the insurer intends the language to mean.  Instead, the court must view the language as to what a reasonably prudent insured would understand the language to mean.  This does not mean that the policy should be construed according to the insured's uninformed expectations of the policy's coverage.
>
> Courts should not strain to find an ambiguity when common sense shows there is none.  The court must consider the terms of an insurance policy as a whole, without fragmenting the various provisions and endorsements.
>
> As a general rule, exceptions, limitations, and exclusions to insurance policies are narrowly construed.  The insurer assumes the duty to define limitations to an insured's coverage in clear and explicit terms.  To restrict or limit coverage, an insurer must use clear and unambiguous language.  Otherwise, the insurance policy will be construed in favor of the insured.

Marshall v. Kan. Med. Mut. Ins. Co., 276 Kan. 97, 111-12, 73 P.3d 120, 130 (2003) (internal citations omitted).  These principles have repeatedly been stated by the Kansas courts.  See, e.g., Shelter Mut. Ins. Co. v. Williams, 248 Kan. 17, 23, 804 P.2d 1374, 1379 (1991); Scott v. Keever, 212 Kan. 719, 723-25, 512 P.2d 346, 350-51 (1973);

-14-

<u>Fiorella v. Travelers Prop. Cas. Ins. Co.</u>, 142 P.3d 321, 326 (Kan. Ct. App. 2006); <u>Anderson v. Nationwide Life Ins. Co.</u>, 6 Kan. App. 2d 163, 167, 627 P.2d 344, 347 (Kan. Ct. App. 1981).

Plaintiffs devote many pages of their response to stating these general rules of contract law.  (<u>See</u> Doc. 28 at 29-40.)  Plaintiffs do not argue, however, that the policy contains conflicting terms. The court finds the policy is clear and unambiguous, because there is no language in the policy which causes "doubtful or conflicting meaning" when the policy is viewed by the reasonably prudent insured. <u>See</u> <u>Fiorella</u>, 142 P.3d at 326.

The policy language at issue states, under the coverage of personal property section of the policy, that it covers loss from "theft" but "only when it is likely that a theft occurred."  The policy goes on to state that it does not cover "theft from the insured premises while the dwelling is under construction, until the dwelling is completed and occupied."  The policy excludes coverage when the insured has committed fraud.  Fraud is defined by the policy as "any concealment, misrepresentation or attempt to defraud by any insured either in causing any loss or in presenting any claim."

The question before the court is whether plaintiffs have stated a genuine issue of material fact with respect to whether defendant's denial of plaintiffs' claim was a breach of the insurance contract made between plaintiffs and defendant.  The uncontroverted facts show that one of the policy's terms precluded coverage of theft from dwellings that were under construction until the dwelling was "completed and occupied."  Plaintiffs do not dispute that their dwelling was under construction. Plaintiffs do, however, dispute the

-15-

"completed and occupied" language but do so only by pointing to affidavits which state that plaintiffs did occupy their dwelling through the dates of coverage.  Plaintiffs do not controvert the fact that their dwelling had not been "completed."  In fact, plaintiffs admit that the construction on their home was ongoing.  Because the policy precludes coverage for theft when the dwelling under construction is not "completed <u>and</u> occupied," plaintiffs have not stated a genuine issue of material fact with respect to whether defendant breached the insurance contract.  Reliance on this policy term is clearly permitted by the policy and defendant could not have breached the insurance contract when it denied plaintiffs claim.

Defendant argues multiple additional bases exist supporting its denial of plaintiffs' claim.  For example, although plaintiffs now produce affidavits stating plaintiffs dwelling was occupied by plaintiffs during the time period in question, at the time of defendant's denial of plaintiffs' claim, this evidence was not presented to defendant and the statement defendant had from Kostelecky showed that plaintiffs were <u>not</u> occupying the dwelling during that time.  In addition, defendant had evidence that plaintiffs had misrepresented their loss, by claiming items which were later discovered in their trailer, or items that had been given to other individuals.  In affidavits, plaintiffs controvert whether the items claimed as stolen had been given to other individuals, but the evidence before defendant at the time of denial supports defendant's denial on the basis of fraud, at that time.  All of these policy provisions were mentioned in defendant's denial letter, and any one of these bases supports denial of plaintiffs' claim by defendant and

-16-

the conclusion that defendant did not breach its insurance contract with plaintiff.

It was plaintiff's burden to prove that their loss was of the type included within the coverage of the policy. See Clark Equip. Co. v. Hartford Accident & Indem. Co., 227 Kan. 489, 491, 608 P.2d 903, 906 (1980). Plaintiffs did not do so and defendant was justified in denying plaintiffs' claim. Therefore, the claim of breach of contract fails because plaintiffs cannot show a breach of the insurance policy.[5]

**B.  Unlawful Insurance Claims Practices**

Defendant alleges, and plaintiffs concede, that there is no private cause of action for unlawful insurance claims practice under Kansas law. See Earth Scientists (Petro Services) Ltd. v. United States Fid. & Guar. Co., 619 F. Supp. 1465, 1468-69 (D. Kan. 1985) (holding that the Kansas Uniform Trade Practices Act, the Kansas statutory scheme for regulating the business of insurance, does not provide a private cause of action in favor of an insured for an insurer's violation of the Act); Spencer v. Aetna Life & Cas. Ins. Co., 227 Kan. 914, 926, 611 P.2d 149, 158 (Kan. 1980) (holding that the tort of bad faith against an insurer by an insured is not

---

[5]  Defendant cites and discusses multiple cases applying the standard of whether an insurer acted without just cause or excuse in denying the insured's claim. Defendant fails to note, however, that the cases it is relying on all deal with a claim of an insured for attorney's fees pursuant to a Kansas statute. E.g., Brown v. Combined Ins. Co. of Am., 226 Kan. 223, 227, 597 P.2d 1080, 1084 (1979); Koch v. Prudential Ins. Co. of Am., 205 Kan. 561, 563-64, 470 P.2d 756, 759-60 (1970); Thompson Transp. Co. v. Middlestates Constr. Co., 195 Kan. 172, 172-73, 403 P.2d 999, 1000 (1965); Salt City Bus. Coll., Inc. v. Ohio Cas. Ins. Co., 4 Kan. App. 2d 77, 79, 602 P.2d 953, 955 (Kan. Ct. App. 1979). These cases, and the standards they enunciate and apply, are not applicable to the case at hand.

recognized in the state of Kansas). Plaintiffs state that the court should recognize the cause of action, but state no reasoned basis, either in fact or law, for doing so.

## C. Waiver and Estoppel

Plaintiffs purport to state a claim for "waiver and estoppel" and their brief intimates that defendant has waived the "complete and occupied" "exclusion" to the policy and should be estopped from denying coverage on this basis because defendant knew plaintiffs' dwelling was being renovated. (Doc. 28 at 50.) Defendant contends that the "complete and occupied" policy provision is not an exclusion to the insurance policy, but a coverage term, and, as such, the doctrines of waiver and estoppel are inapplicable. (Doc. 24 at 27.)

The court first notes that although plaintiffs stated in their February 2000 application for insurance that plaintiffs were "completely redoing and adding to the house," the application also stated that the "roof has nothing on top - he's replacing now" and plaintiffs wrote, regarding the roof, "2000 putting on now." Plaintiffs also allege that following a storm in 2001, plaintiffs made a roof damage claim and defendant's inspectors viewed plaintiffs property at that time. Plaintiffs alleged date of loss, however, was September 2003, two years after plaintiffs last informed defendant that their home was under construction.

In any event, Kansas cases have consistently held that waiver and estoppel cannot be used to expand coverage of an insurance policy where the policy unambiguously excludes coverage for the insured's claim. Von Hillman v. Colonial Penn Ins. Co., 19 Kan. App. 2d 375, 377, 869 P.2d 248, 249 (1994). For example, in Western Food Products

Co. Inc. v. U.S. Fire Ins. Co., 10 Kan. App. 2d 375, 699 P.2d 579 (1985), in litigation over the denial of a claim involving an airplane crash, the court stated:

> Plaintiff's final argument is that since the insurer should have known from the information submitted to it that the pilot did not have a current medical certificate, it is estopped from denying coverage.  It is a general rule, acknowledged in this jurisdiction, that waiver and estoppel may be invoked to forestall the forfeiture of an insurance contract, but they cannot be used to expand its coverage.  Ron Henry Ford, Lincoln, Mercury, Inc. v. Nat'l Union Fire Ins. Co., 8 Kan. App. 2d 766, 769, 667 P.2d 907 (1983).  We have concluded that the defendant's policy unambiguously excludes coverage of the factual situation in this case.  There is no forfeiture of coverage being affected; the insured was never protected for the circumstances which took place.  Therefore, the equitable relief of estoppel claimed by plaintiff is inappropriate because it would operate to expand the plain scope of the insurance policy.

Id. at 381, 699 P.2d at 584.  Because the insurance policy unambiguously excludes coverage of the claim made in this case, plaintiffs may not invoke the principles of waiver and estoppel.

IV.  **CONCLUSION**

Defendant's motion for summary judgment is GRANTED, for the reasons stated herein.  The clerk is directed to enter judgment pursuant to Rule 58.

A motion for reconsideration of this order pursuant to this court's Rule 7.3 is not encouraged.  The standards governing motions to reconsider are well established.  A motion to reconsider is appropriate where the court has obviously misapprehended a party's position or the facts or applicable law, or where the party produces new evidence that could not have been obtained through the exercise

-19-

of reasonable diligence.  Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise available for presentation when the original motion was briefed or argued is inappropriate. Comeau v. Rupp, 810 F. Supp. 1172 (D. Kan. 1992).  Any such motion shall not exceed five pages and shall strictly comply with the standards enunciated by this court in Comeau v. Rupp.  The response to any motion for reconsideration shall not exceed five pages.  No reply shall be filed.

IT IS SO ORDERED.

Dated this   27th   day of April, 2007, at Wichita, Kansas.

                              S/ Monti Belot
                              Monti L. Belot
                              UNITED STATES DISTRICT JUDGE